IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **LITASCO SA** | § § | |
| v. | § § § | **CIVIL ACTION NO.** |
| **N2 TANKERS B.V.** | § § § § § § | 22-cv-_____ |
| | | **ADMIRALTY RULE 9(h)** |

## VERIFIED COMPLAINT

Plaintiff LITASCO SA ("Litasco" or "Charterers") files this Verified Complaint against Defendant N2 TANKERS B.V. ("N2 Tankers" or "Owners") and alleges upon knowledge as to its own acts and upon information and belief as to Owners and third parties as follows:

1. Litasco's address at its principal place of business is Geneva 3, rue Kazem-Radjavi, CH - 1202 Geneva, Switzerland; upon information and belief, N2 Tankers' principal place of business is in The Netherlands at De Entree 53, Alpha Tower, 1101 BH Amsterdam.

## SUBJECT MATTER JURISDICTION

2. This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333.

## PARTIES

3. Litasco is a foreign business entity organized and existing under the laws of Switzerland. Litasco was the charterer of the vessel M/T NORDBAY.

4. Upon information and belief, N2 Tankers is a foreign joint venture or business entity with a principal places of business in Amsterdam. At all relevant times referred to herein, N2 Tankers was the disponent owner of the M/T NORDBAY.

## FACTS

5. Litasco sought ocean transportation of a supply of previously extracted crude oil, which was no longer on a field production site, to be stored in the Port of Novorossiysk for vessel loading purposes.

**The Voyage Charter**

6. The Charterers and Owners entered into a voyage charterparty dated February 24, 2022 (the "Charterparty") in respect of the M/T NORDBAY (the "NORDBAY" or the "Vessel"), which is a crude oil tanker. The Charterparty consisted of a recap incorporating the provisions of the ExxonMobil VOY 2005 form and rider clauses. Attached hereto as Exhibit 1 are true and correct copies of the recap, form and riders constituting the Charterparty.

7. Pursuant to the Charterparty, the Owners agreed to carry a minimum of 80,000 MT of crude oil on board the Vessel from "*1 SAFE PORT NOVOROSSIYSK*" to a range of ports in the Black Sea, Mediterranean or English Channel, at the Charterers' option, in return for payment of freight.

8. More specifically, the Charterparty provided among other things, as follows:

a) The laycan (the period during which the vessel must arrive at port) under the Charterparty, set out in the recap, was March 5, 2022 (00.01 hrs) – March 6, 2022 (23.59 hrs) with Charterers having an option to narrow the laycan to one day (i.e. 00.01-23.59 hrs).

b) Clause 4(a) of the Charterparty, as amended, provided *inter alia* that the "*Vessel shall proceed with utmost dispatch AS PER THE AGREED C/P SPEED - ABOUT 12.5 KNOTS - to any port(s) or place(s) as ordered by Charterer in accordance with Part I (C) and there load a cargo as specified*".

9. The Charterparty is governed by English law and is subject to arbitration in London.

**The Charterers' Voyage orders**

10. On or about February 28, 2022, the Charterers issued orders for the Vessel to sail to the contractual load port, Novorossiysk, and also gave notice narrowing the laycan to March 5, 2022 (00.01-23.59 hrs) in accordance with the Charterparty. Attached hereto as Exhibit 2 is a true and correct copy of the Charterers' orders.

11. Upon information and belief, at the time the aforementioned orders were given, the Vessel was sailing to Burgas, Bulgaria, having loaded cargo at Novorossiysk shortly beforehand under a previous fixture (chartering arrangement).

12. On March 1, 2022, the Vessel completed discharging at the port in Burgas, Bulgaria. At that point, the Vessel ought to have sailed to Novorossiysk with *"utmost dispatch"* and in accordance with clause 4(a) of the Charterparty and the Charterers' order of on or about February 28, 2022.

13. The Vessel, however, did not leave Burgas on March 1, 2022. On March 2, 2022, the Owners stated that while they were not cancelling the Charterparty (for the avoidance of doubt they had no right to do so), the Owners asked Charterers whether they would *"mutually agree that the c/p should be cancelled and washed out, with no liabilities incurred on either side"*. Attached hereto as Exhibit 3 is a true and correct copy of the above-referenced communication.

14. On March 3, 2022, the Charterers responded, stating that the failure of the Vessel to sail Novorossiysk was a breach of the Charterparty and asking that the Owners *"confirm by return that you shall follow our orders and proceed to Novorossiysk"*. The Owners replied that same day to say, *inter alia*, that they were liaising with their legal counsel and would revert. Attached hereto as Exhibit 4 is a true and correct copy of the 3-2-22 exchange between the parties.

15. The confirmation sought was never received.

16. In the absence of any satisfactory response or the necessary confirmation, on the evening of March 3, 2022, the Charterers commenced the search for alternative tonnage, which was ultimately procured by fixing another vessel in mitigation of the Charterers' losses.

17. On March 4, 2022, during a telephone call between Mr. Ed Averill of the Owners and Mr. Thies Petersen of the Charterers, the Owners advised the Charterers that the position had not changed at all: the Vessel was still at Burgas and was not, nor would be, sailing to the loadport. Once again, the Owners attempted to obtain the Charterers' consent "mutually" to terminate the Charterparty, which was refused by Mr. Petersen of the Charterers.

18. By March 5, 2022, at the latest:

a) in all the circumstances, the totality of the Owners' words and/or conduct referred to above was renunciatory in nature; and

b) further or alternatively, the Owners were in actual repudiatory breach of clause 4(a) of the Charterparty, as the Vessel had failed to sail to the loadport with utmost (or, indeed, any) dispatch, such that it was inevitable that the Vessel would miss her cancelling date.

19. On March 5, 2022, the Charterers accepted the Owners' repudiatory breaches of the contract.

20. On March 11, 2022, the Charterers (via their English solicitors) demanded payment of USD 2,317,500, representing the Charterers' losses resulting from the Owners' repudiation of the Charterparty, as more fully set forth below. Attached as <u>Exhibit 5s</u> is a true and correct copy of said demand. That sum remains unpaid and will be sought by the Charterers as damages in the London Arbitration which has been commenced against the Owners and in respect of which Claim Submissions will be shortly served.

**The Charterers' claims**

4

Case 2:22-cv-02748-JMV-AME   Document 1   Filed 05/11/22   Page 5 of 12 PageID: 5

21. As a result of the Owners' renunciatory or repudiatory breach of the Charterparty, the Charterers have suffered the following loss and damages.

*Freight differential*

22. The Charterers renunciated the Charterparty and otherwise effectuated a repudiatory breach of their obligations to perform thereunder. The Charterers are entitled to and claim the difference between:

a) freight in fact paid by the Charterers under the replacement charterparty, namely USD 3,000,000, representing the Charterers' losses and/or the cost of mitigation and/or the market rate of freight at the material time; and

b) freight that would have been payable under the Charterparty, namely USD 682,500,

i.e. **USD 2,317,500**

*Interest and costs*

23. The Charterers are further entitled to and claim:

a) interest at such rate over such period and compounded; and

b) the costs and fees of the reference to arbitration.

**Pending Arbitration & Attorneys' Fees**

24. The Charterers are pursuing a London arbitration against the Owners which has been commenced.

25. Under English Law, pursuant to Section 61(2) of the Arbitration Act of 1996, costs follow the event; such costs to include the costs of arbitration and litigation, including attorneys' fees, costs, and expenses.

26. The Charterers wrote to the Owners on March 31, 2022 with respect to their damages and the fact that the Charterers were seeking security, which the Owners have refused to provide.

27. The Charterers reserve all rights to seek increased security as may be needed in this proceeding. Likewise, the Charterers reserve all rights to seek and recover the full quantum of their damages, attorneys' fees, costs, interest and other expenses in arbitration in England.

### BREACH OF MARITIME CONTRACT UNDER U.S. LAW

28. The Charterparty is a quintessential maritime contract, as it is a voyage charter party for vessel services.

29. The Owners renunciated the Charterparty and otherwise effectuated a repudiatory breach of their obligations to perform thereunder, thereby causing damages to the Charterers which the Owners have refused to pay.

30. In view of the foregoing, the Owners have thereby breached a maritime contract, giving rise to a quintessential maritime or admiralty claim.

### SUPPLEMENTAL RULE B ALLEGATIONS

31. As set forth above, pursuant to the Charterparty, the Charterers have commenced arbitration in London in order to resolve the dispute, and the Charterers expressly reserve all rights with respect to the same.

32. The Charterers bring this action solely to obtain *quasi in rem* jurisdiction over the Owners, and to secure the claims being pursued in the London arbitration more fully described above.

**N2 Tankers cannot be found in this District**

33. After a diligent search, as is set forth in the accompanying Declaration of Edward W. Floyd, the Charterers respectfully submit that the Owners cannot be found within this District within the meaning of Supplemental Rule B.

34. Diligent searches of the website maintained by the New Jersey Secretary of State, of the internet Whitepages directory, and a general internet search via Google did not identify the Owners as:

   a) Ever being registered or authorized to transact business in the State of New Jersey;

   b) Being incorporated or registered in the State of New Jersey;

   c) Having appointed an agent for service of process in this District; or

   d) Having any other presence in this District.

35. Further, the Charterers are unaware of the Owners having any general or managing agents in this District.

36. Accordingly, N2 Tankers cannot be "found" within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, and Litasco seeks an Order of Attachment against such property, tangible or intangible, of N2 Tankers as may be found within the District, up to and including the full amount claimed herein (and subject to the Charterers' reservation of all rights to adjust that amount as may become necessary and proper).

37. The Charterers are accordingly entitled to attach the Owners' property within this District pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure.

**The property of N2 Tankers is or will be in this District**

38. On information and belief, N2 Tankers has or soon will have tangible property in this District on the Vessel.

39. The source of that information is N2 Tankers, which, on May 4, 2022, distributed its "position list" of various vessels in its fleet, including the NORDBAY, which indicated that it would be "open" (meaning available for charter) on May 14, 2022 at the Bayway terminal.

40. The Bayway terminal is the marine terminal for the Bayway Refinery, which is located on the New York Harbor in Linden, New Jersey.

41. Publicly available information on the location and destination of vessels, namely marinetraffic.com., indicated on May 6, 2022 that the NORDBAY was at Ambrose anchorage in the New York bight (approximately 40 miles due east of the coast of New Jersey), and on May 10, 2022 that it was underway (presumably to the Bayway terminal).

42. The Charterparty is a voyage charter, *to wit*, in general terms, it is the chartering of the Vessel for a one-way voyage between specific ports with a specified cargo at a negotiated rate of freight. The rate of freight charged to the charterer is a function of the owner's costs and the owners or its agent remain in physical control of the vessel.

43. In general, under a voyage charter, the owner arrives with the vessel at the loadport designated by the charterer, having readied the vessel for the voyage, including having procured the fuel a/k/a bunkers necessary and sufficient for the voyage.

44. For illustration, the Charterparty at issue is consistent with the typical voyage charter in the foregoing respects, that is, the Owners were responsible for giving notice of readiness of the Vessel, and "VESSEL SHALL HAVE SUFFICIENT BUNKERS TO PERFORM INTENDED VOYAGE." Ex. 1, Sec. 11.

45. Consistent with the foregoing, in the event the Vessel did not have sufficient bunkers, the Charterparty provided that "[w]hen, in connection with the performance of any voyage provided for in this Charter, Owner plans to purchase bunkers at any port(s) outside the

United States or its territories, Owner shall purchase the bunkers from Charterer or its designated Affiliate(s) whenever they are so available at competitive prices AND TERMS." Ex. 1, Sec. 26.

46. The fact that the NORDBAY will be "open" at the Bayway terminal as of May 14, 2022 strongly suggests that the NORDBAY is presently under a voyage charter terminating at the Bayway terminal, in which event the NORDBAY would be supplied by bunkers owned by N2 Tankers.

47. Consistent with the foregoing, on information and belief, including public, online job descriptions, N2 Tankers presently employs staff for its Tanker Bunker Procurement, which is consistent with its obligation to provide bunkers in furtherance of its voyage charters.

48. On the basis of the foregoing facts and information, it is Litasco's reasonable belief that the bunkers presently within the NORDBAY's bunker tanks are property of N2 Tankers.

49. Accordingly, Litasco respectfully seeks to attach the bunkers on the Vessel pursuant to Supplemental Rule B.

## AS AND FOR A FIRST CAUSE OF ACTION: ATTACHMENT OF TANGIBLE PROPERY ONBOARD THE NORDBAY

50. N2 Tankers renounced and repudiated it maritime contractual obligations to Litasco.

51. N2 Tankers' breach caused Litasco to suffer damages of not less than $2,317,500, plus interest, costs and attorney's fees (which are recoverable under English law).

52. Litasco expressly reserves all of its rights to have the underlying merits of its claims resolved by the pending arbitration in London.

53. Litasco brings this action to obtain *quasi in rem* jurisdiction over N2 Tankers, and security for the enforcement of any resulting awards and/or judgments which it may obtain against N2 Tankers.

54. N2 Tankers cannot be found within this District, but its property (namely the bunkers onboard the Vessel) may, or soon will be, found within this District.

55. Litasco is accordingly entitled to attach N2 Tankers' property (namely the bunkers onboard the Vessel) within this District.

56. Plaintiff seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching any and all assets of Defendant up to the amount of $2,317,500 for the purpose of obtaining personal jurisdiction over Defendant and to secure Plaintiff's claims, as described above.

WHEREFORE, Plaintiff prays for the following:

(A) That process in due form of law issue against Defendant citing it to appear and answer under oath all and singular the matters alleged in this Verified Complaint, failing which default judgment be entered against it in the amount of $2,317,500, plus attorneys' fees, costs and interest;

(B) That since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, tangible or intangible, in whatever form, in the amount of $2,317,500 to establish personal jurisdiction over Defendant and to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rules B and E, answer the matters alleged in this Verified Complaint;

(C) That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the existing claims pending against Defendant;

(D) That this Court recognize and confirm any award or judgment(s) rendered on the claims against Defendant set forth herein as a judgment of this Court; and

(E) For such other and further relief as the Court deems just and proper.

Dated: May 11, 2022

        Respectfully submitted,

        /s/ Edward W. Floyd
        Edward W. Floyd

        ed.floyd@zeilerfloydzad.com

        **Zeiler Floyd Zadkovich (US) LLP**
        215 Park Ave. South, 11th Floor
        New York, New York 10003
        917-999-6914

        *Attorneys for Plaintiff*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, _Frederik Peels_ declares are follows:

I am _Legal Counsel_ of Plaintiff LITASCO SA and an authorized officer thereof. I have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, and as to matters stated to be upon information and belief, I also believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 11th day of May, 2022 in _Geneva_, _Switzerland_

_Frederik Peels_
INSERT NAME